Q Your home here in Massachusetts?
A Correct.
Q What's your phone number there, sir?
A 617-367-7321.
Q Do you know what Mr. Raftery's phone number is?
A No. I know the main number, but I don't know his extension number.
Q Do you currently use a cellphone, sir?
A Yes, I do.
Q What's your cellphone number?
A 617-908-7494.
Q How long did your conversation with Mr. Raftery take?
A Five minutes.
Q Did he tell you what he intended to do with the subpoena he received?
A No, he did not.
Q Have you given a copy of the statement Mr. Raftery gave to you to your counsel?
A Yes.
Q Has your counsel had that statement since the beginning of this case, sir?
A No.

A Yes, I do.

Q What is this document, sir?

A I believe it's when I bought my house in Sherborn.

Q There was a lawsuit filed in connection with that, sir?

A Not that I'm aware of or remember.

Q Well, you would agree that's your name at the top of that page, right?

A Yes.

Q That's your wife's name; is that correct?

A That's correct.

Q This Complaint was filed by an attorney, Charles Yon, out in Sherborn?

A No.

Q So you have no memory whatsoever of this case or this dispute, is that your testimony, sir?

MR. ROUGHSEDGE: Objection.

A If you give me a minute I'll read it.

Q Please, take your time.

A Yes, I do remember it now.

Q Tell me what you recall being disputed in that case, sir?

A A pipe under the driveway had broken and

resulted in a water leak and it was supposed to have been repaired prior to us moving into the house. And it turned out we had to tear the driveway up and stuff, and that was the cause of it.

Q On page 4 of this complaint, first question, so you do recall authorizing Attorney Yon to file this case on your behalf, right?

A No, but I'm sure I did.

Q On page 4 there's a count for fraud?

A Yes.

Q You see that, right, sir?

A Yes.

Q And part of your allegations in this case were that the buyers of the home made a bunch of verbal representations to you; is that right?

A That's correct.

Q How did this case turn out? What happened?

A I don't remember.

Q Do you know if you were deposed in this case, sir?

A I don't remember. I don't think so.

Q Have you ever been a defendant in a case,

sir?

A Defendant in a case--

MR. ROUGHSEDGE: Other than the one he's told you about?

MR. BEELER: Other than the one he's told me about.

A Not that I remember.

Q Data General sued you, didn't they, sir?

A Not that I recall.

Q Did you ever sue Data General?

A We saber-rattled about a suit, but I don't think I ever filed a suit.

Q What was the suit that you saber-rattled about?

A I had borrowed money from Data General to purchase some stock under an executive stock plan. And I received a verbal commitment from Jim Campbell that that loan would either be forgiven or played out with no interest over a very long period of time, and they reneged on that commitment.

Q That was a verbal commitment; is that right, sir?

A That's correct.

Q You don't remember the lawsuit being filed against you by Data General and you settling that case?

A I recall a settlement. I didn't recall that they filed a suit.

Q Subsequent to that settlement to the case Data General brought against you, you filed a lawsuit against Data General, correct?

MR. ROUGHSEDGE: Objection.

A I don't recall.

MR. BEELER: Mark this, please.

(Amended Complaint, marked as Exhibit No. 2.)

Q Do you recognize that document?

A Yes, I do.

Q Do you recognize that as the complaint that was filed on your behalf in your lawsuit against Data General Corporation?

A Yes, I do.

Q You were deposed for two days in connection with the Data General litigation, weren't you, sir?

A I cannot recall.

Q You don't't?

A Nope.
Q Do you remember an Attorney Joy?
A I'm sorry?
Q Do you remember an Attorney Joy at Morgan, Brown and Joy?
A No.
Q Now, you were having a problem with Ronald Skates at Data General according to your Complaint, right?
A That's right.
Q What was the problem with Mr. Skates?
A We had a mutual dislike.
Q The essence of your Complaint against Data General was that you had been given various verbal assurances with Mr. Bateman and others, right?
MR. ROUGHSEDGE: Objection.
A Correct.
Q Who are the others who told you things verbally?
A Jim Campbell and Herb Richmond.
Q I'm going to ask you turn to Count 2 in Exhibit 2. You see that Count there for fraud, sir?

A Yes.

Q Again, that was based on these alleged verbal statements made by people working at Data General; is that right?

A That's correct.

Q If you go down a few pages you'll see a count for beach of contract. You see that?

A Yes, I do.

Q Again, that was based on these verbal statements by people at Data General, correct?

A I believe that was based on the compensation plan.

Q Your attorney in this case was John Erland, right?

A Yes.

Q How did this case turn out?

A Ahm, I agreed to repay a loan and Data General paid me, I think, $70,000. I'm not sure.

Q So that's your memory of the way that the case revolved; is that correct?

A Correct.

Q If you keep flipping there, sir, there's an

Exhibit A, which is a settlement agreement between Data General and Francis M. Keaney. Go one more page. Do you see that document, sir?

A Yes.

Q There are a number of them; is that right?

A I'm sorry?

Q There are three separate copies of that agreement. They differ somewhat, but your signature appears on the last one, right?

A My signature appears on the last one, yes.

Q That was in settlement of Data General's claims against you, right, if you look at the caption on the front of that?

A It says between Data General and Francis M. I don't know whether it's mine against them or them against me.

Q Well, you're listed as the defendant, correct, sir?

A Yes. Sorry.

Q And you executed that settlement agreement with Data General in December of '99, right? I'm sorry December of '89, if you look at the date next to your signature, sir.

A Yep.

Q You'll see that, attorney for the defendant, Robert Joy. You don't remember spending two days with Mr. Joy in the deposition?

A This says Mr. Dwyer.

Q Down at the bottom, sir.

A Are you referring to this one back here?

Q Yes.

A Stipulation of dismissal?

Q Yes.

A No, I don't recall spending two days with him.

Q On the front of this Complaint it's noted as a 1992 case, your case against Data General; is that right? It says Docket No. 1992?

A I don't see that.

Q In the upper right-hand corner.

A MCV 1992? Yes.

MR. ROUGHSEDGE: Objection.

Q You see the date from the file from the clerk's office, August 13, 1992. You see that, right?

A Yes.

Q Do you recall why you waited about three

years to file the claim against Data General following the settlement of Data General's claim against you?

A Say it again, please.

Q Do you recall why it was that you waited three years following the settlement of Data General's claim against you to file this claim against Data General?

A Yes.

Q Why?

A Because I had been working with the Data General legal department, I believe the gentleman's name was Jacob Frank, who indicated to me he was going to come to a reasonable settlement.

Q So this litigation between and you Data General took place over four years or so, right?

A Yes.

Q A fairly significant effort on your part both to defend the case and to bring your case, right?

A No.

Q Any other lawsuits you have been involved in,

sir?
A Not that I recall.
Q As best you can recall, as you sit here today, how much money did you pay to Data General to settle their suit against you?
A I don't remember.
Q Can you give me the name of every corporation that you have ever formed?
A FMK Associates, I'd have to ask my financial advisor if they have set up some corporations. I don't remember the names.
Q Who's your financial advisor, sir?
A Mark Murphy. He's also my attorney.
Q So as far as specifics of the corporations that you may or may not have set up, would Mr. Murphy likely have that information?
A Yes.
Q Other than as a financial advisor, do you have any other relationships with Mr. Murphy?
A He's my nephew.
Q Any other relationships?
A I don't know what you mean.
Q Did he do anything for you other than be your nephew and serve as your financial advisor,

Q What time did you get there that night?
A I don't remember.
Q So the four of you started in the bar; is that right?
A Uh huh.
Q Is that a yes?
A Yes.
Q During the discussions you were having some drinks and talking with them; is that right?
A Correct.
Q What were you drinking, do you know?
A Don't remember.
Q What do you typically drink?
A Either scotch and water or beer, Guiness.
Q What kind of scotch?
A Dewar's or J&B. Sometimes Irish whiskey.
Q Do you know how long you were in this bar at the hotel speaking with them and drinking?
A As I recall it was quite a long night, probably four hours.
Q Then you went out after that?
A No, this was the time we spent together.
Q What was the purpose of the meeting?
A It started out as social. It evolved into a

MR. BEELER: Mark--

MR. ROUGHSEDGE: Before you get into that, why don't we take a lunch break?

MR. BEELER: That's fine.

[Lunch break 12:50 p.m.]

MR. BEELER: Back on the record.

[1:45 p.m.]

Q Mr. Keaney, going back to the tax returns that we looked at for FMK Associates, you indicated that one of the reasons for the discrepancies between the monies paid by Eastern to FMK Associates and the gross revenues reported by that corporation would have been factoring, right?

A Yes.

Q Can you explain to me in a little more detail what factoring is?

A To be honest, no. My lawyer could, Mark Murphy.

Q And he's your financial advisor, sir?

A Yes.

Q He's also your nephew, right?

A Yes.

Q And he's also your business partner in FMK,

correct?
A No.
Q According to the documents we looked at earlier he's an officer of FMK, correct?
A If that's what the document says, yes. But he's not a partner.
Q So you wouldn't know whether the use of factoring allows you to omit sums from gross income on a federal tax return for a corporation, correct?
A No, I wouldn't know that.
Q He would be the person who will be able to explain this to me?
A Yes.
Q Did you sign the tax return for FMK, or did he?
A I signed them.
Q Just to be clear. You never considered the fact that perhaps you weren't getting all the money you were due from Eastern through FMK, correct?
MR. ROUGHSEDGE: Objection.
A I don't understand the question.
Q If Eastern paid $200,000 in one year and the

tax returns reflect less than that for gross revenue, did you ever consider that you weren't getting all the money you needed or you weren't getting paid by Eastern because of some glitch at FMK?

MR. ROUGHSEDGE: Objection.

A I didn't know whether all of my Eastern money went to FMK or some went to me personally. I frankly don't know how the accountant treats it.

Q But you had requested in 1999 that Eastern pay all of the money for the work you did to FMK on a 1099, right?

A As I indicated before, I am not certain whether there was money owed or not money owed. I don't know.

Q But you had requested that all the money be paid to FMK, correct?

A Correct.

Q Back to your involvement, your second year with Mr. Lynch and Mr. Williams where this issue of the third interest was first raised, what did you provide to Mr. Lynch and Mr. Williams in exchange for that, if

anything?
A My work efforts.
Q You testified in the Madison guarantee case that you were given a third of the case for nothing, right?
A A third of the case?
Q I'm sorry. A third of the business for nothing. Do you recall that, sir?
A That's correct.
Q You really didn't put anything into it. You were just given it, right?
MR. ROUGHSEDGE: Objection.
A I put the most important thing you can put into it, your time.
Q What's that?
A Your time.
Q At the time the offer was made, sir, according to you, you hadn't put anything in, fair?
A Correct. I hadn't gotten anything out either.
MR. BEELER: Mark this, please, as the next exhibit.
(Handwritten Note, marked as Exhibit No. 11.)